We move to the seventh case this morning, Olivas v. Saul. Good morning, Your Honor. Good morning, Your Honors. Richard Stavins on behalf of the Appalachian, Stephanie Olivas. Stephanie Olivas is a mentally and physically sick lady. She's 38 years old and has, according to the medical, treating doctors' medical records, that are a part of the record in this case, a long litany of chronic physical and mental illnesses. Depression, bipolar disease, chronic depressive personality disorder, obsessive compulsory disorder that consists of chronic washing of her hands to get rid of imaginary germs to a point where her hands are chafed and red and raw. Obsessive compulsory disorder also consisting of constantly checking of the door locks at her home and obsessive cleaning of her home. Mood disorder, mood swings, severe anxiety, catastrophic in nature, paranoia, forgetfulness, memory problems, panic disorder, panic symptoms, claustrophobia, insomnia, post-traumatic stress disorder, tearfulness, rapid breathing, bulimia, temper tantrums, unable to sit for more than 15 minutes, uncontrolled fibromyalgia. Fibromyalgia is an incurable muscular skeletal disease that is manifested by pain, fatigue, sometimes by memory and mood problems, anxiety and depression. Also she has severe back pain, neck pain, radiculopathy, meaning pain radiating out of the neck down the arms, head pain, headaches, chronic physical pain, numbness in both arms and degenerative disc disease. She has a history of bulimic behavior, flashbacks, paralyzing fears. Her doctor says she cannot work outside of the home due to a combination of these impairments and particularly her physical pain, emotional imbalance and personality disturbances and her psychological functions are significant enough to eliminate any options for working outside the home. She has difficulty leaving her home due to her mental health. Her complaints have been constant over the years. She has pain flares that occur four to six times weekly and an MRI study of her cervical spine is consistent with her physical complaints. Despite all of this, the administrative law judge thought this lady could be gainfully employed. It's just plain wrong. This case cries out for reversal of the administrative law judge and of the district court that affirmed the ALJ. The ALJ said, well, she can sit for an eight-hour workday, although the evidence is she can only sit for 15 minutes and the ALJ said, well, she can sustain her attention and concentration in two-hour increments. Now, what employer is gonna employ somebody like this? Most respectfully, this lady is not gainfully employed and this was manifest error on the part of the administrative law judge. This court is not the rubber stamp for the ALJ and I respectfully request a reversal and an order that this lady be given social security disability benefits. Thank you very much, your honors. Thank you, counsel. May it please the court, John Chadwick on behalf of the Commission of Social Security. Good morning, your honors. A few points first and then I want to respond to opposing counsel's points. It's significant here, your honors, that the sole issue in this case, the only issue here before the court is the ALJ's assessment of the opinions of primary care physician, Dr. Crow and the treating psychiatrist, excuse me, Dr. Lopez. The ALJ weighed their opinions in accordance with the regulations and provided good reasons for finding each of them worth little weight. The ALJ more than met her burden of minimally articulating her reasons and substantial evidence supports her assessments of those opinions. Additionally, the ALJ considered Dr. Crow's 2014 narrative but found nothing therein to be an opinion needing to be weighed. And further, Ms. Olivas has waived any other argument, including her argument about the ALJ's consideration of treatment gaps, which she raised the first time before this court, and her wholly undeveloped cherry-picking argument. Therefore, the ALJ's decision should be affirmed. The ALJ considered Dr. Crow's September 2015 opinion and articulated numerous good reasons for discounting it. Chief among them was that it was very inconsistent and unsupported by the record, particularly Dr. Crow's own treatment notes. Those inconsistencies included, among other things, the myriad normal objective findings and examinations throughout the period at issue by various providers, the lack of complaints about ankle symptoms, including Dr. Crow's notes, in Dr. Crow's notes. It bears noting that Dr. Crow, for all of her verbiage in her three-page-long, single-spaced letter, opined actually very little. There was very little substance in it that constituted an opinion. She opined, essentially, arthritis affects her ability to sit or stand consistently for any period. Her ankles can't tolerate more than one hour of standing or walking. Psychiatric conditions significant enough to preclude working outside the home. That was the entirety of her opinion, and the ALJ presented good reasons for finding them unsupported. For instance, as I said, the objective findings throughout the record were not supportive of that. And Ms. Olivas did not complain about ankle symptoms, but one time throughout the entire record, when she mentioned slight swelling at the end of the day, Dr. Crow made no note of that in her treatment notes. There was no reference to fibromyalgia flares in Dr. Crow's treatment notes, despite the fact that Dr. Crow asserted later in her letter that Ms. Olivas has four to six pain, fibromyalgia flares per week. And there was evidence showing that Ms. Olivas did engage in an array of activities, which as the court knows is a legitimate, significant factor for an ALJ to consider. The opinion was vague. It was based heavily on subjective statements. That's evident by the very language that Dr. Crow used. You know, there's a long, he issued a long, long list of things. What is she capable of doing? And I sort of mentioned that, I'd sort of be curious what she is incapable of doing. The RFC, the residual functional capacity found by the ALJ was that she could work at the light exertional level as defined in the regulations. Six hours total of standing or walking through about eight hour workday. Workday with normal breaks. Could sit six hours, about six hours with normal breaks and rest periods. That's lifting, carrying 20 pounds occasionally, 10 pounds frequently. And then there were non-exertional limitations including no climbing of ladders, ropes or scaffolds. Only occasional postural activities such as stooping, balancing, kneeling, crawling, climbing of stairs and ramps. No concentrated exposure to hazards such as unprotected heights. Only simple routine and repetitive tasks. Sustained attention and concentration in two hour segments. No work with the general public at all. And no work involving team tasks or teamwork. And only interacting with her coworkers on a brief and superficial basis. The ALJ did craft a significantly limited residual functional capacity finding based on the evidence. A lot of which focused on, as far as the mental impairment aspect goes, a lot of it focused on anxiety. It was not depression so much as anxiety and as counsel said, obsessive compulsive disorder. But the ALJ accommodated that very well in the RFC. The ALJ explained how the objective and other evidence supported that RFC throughout summarizing how the evidence led to her conclusions. In particular at pages 26 and 27 of the administrative record. The pain from fibromyalgia and degenerative disc disease which were non-severe impairments accommodated by limiting to light exertional level plus occasional posturals. So there were things she could do, I guess. And I just wondered if she did any of those things actually. Did she actually have some function that there's evidence of in the record? Oh, there was a lot of evidence of her functional ability. For instance, the things that she herself reported to her treaters, including Dr. Crow, about her spending more time caring for her infant and toddler daughter by herself. Although initially she did require help. That she attended Weight Watchers meetings weekly. That she would go out with her friends occasionally, go to movies. And that she would, in fact, function outside the home. That was a big thing. That was one of the things that Dr. Crow opined to was that she was limited in her ability to interact in social situations. But there was evidence throughout the record that Miss Olivas could do so. And to the extent that she had difficulties, to be sure, the ALJ did accommodate that in the RFC finding. Was she the, I'll call it caregiver. Those are her two children? I'm sorry? Those are the two children referred to are her children? I believe she had one, I'm sorry. I didn't mean two, Your Honor. At first an infant. Her child was born in 2013, during the period at issue. And by the time the end of the period that is covered by Dr. Crow's notes came about, she was, I guess, a two-year-old child. That's why I said infant and toddler, but it's just one child. Okay, and then she, I assume, takes care of the child. Yes. All right. The same things that the ALJ found about Dr. Crow's opinion were the case with Dr. Lopez's opinion. It was Dr. Lopez's opinion actually didn't constitute an opinion. His letter didn't even say, or Miss Olivas can't do this, can't do that. His letter was simply a to whom it may concern letter in which he said she is reporting that she can't work because of her conditions and she is reporting that she hasn't been able to work since at least 2012. The very language of his letter makes it clear that he was doing nothing but transcribing her subjective reports. And in that regard, subjective reports or self-reports symptoms of which indeed, as counsel pointed out, there are many myriad reported symptoms here, but they can't establish disability under the regulations. Your symptoms alone cannot establish that you are disabled. And the ALJ reasonably found here that her symptoms were not supported. And frankly, there was no argument made by Miss Olivas that the ALJ erred in any way in assessing her subjective statements. The only argument that was raised was the ALJ's assessment of those two opinions. That was it. She did nothing before the district court regarding her other arguments other than making a 14 word long perfunctory and undeveloped argument about cherry picking without identifying a shred of evidence that the ALJ supposedly ignored. That is why those arguments are waived. Unless the court has any other question, the commissioner asks that the court affirm the ALJ's decision. Thank you. Thank you, counsel. To answer Justice Mannion's question, what can she do? The answer is nothing in the way of gainful employment. Imagine you're an employer and you've got an employee who sits there rubbing her hands until they're chafed and washing her hands until they're chafed red. This is an employee that's gonna stay on the job. You're gonna find a reason to discharge that employee. That's the reality of the world. She's got one, no, two year old. Pardon? One, she has a two year old child. She has a child that was born in 2013 and she takes care of that child. And one of the problems she has vis-a-vis that child is she's constantly going into the child's room, checking on the child. This is in the record. Checking on the child for fear that something has happened to the child. This is consistent with her obsessive compulsive disorder, washing her hands, checking the door locks, constantly obsessively cleaning the house, thinking there's germs in the house. This isn't gonna change if she goes to work. Is she the sole caretaker of that child? Yes. Yeah. In fact, she and her husband are separated. It's not a part of the record, but I happen to know that. Is the husband the father of the child? Yes. Okay, at least we got that. Yeah, he's the father of the child, but they are separated. She's been the sole caretaker of the child. As far as the fibromyalgia, which counsel mentioned, there's 13 times in the record where that is diagnosed. I don't know where he gets the idea that something like this is self-reported. And also, this idea of, well, if it's self-reported, therefore it doesn't count. What's the first thing a doctor says when you go to the doctor in his office? He says, what's wrong with you? What brings you here? How are you feeling? Tell me about yourself. Medicine is based upon self-reporting, but these are not, when I read this list, these are not just self-reported things. These are diagnoses, diagnoses by the medical doctors of this lady's conditions of ill-being. As far as the ankle, I never said anything in the opening statement here, my opening argument about the ankle, and I'm not relying on that. Well, you listed a lot of things. It's a lot of things wrong with her, really. And they don't dispute that, interestingly. They don't say, oh, she's faking this or faking that, or it's all a figment of her imagination. Nobody is saying anything like that. It's real. It's really a tragedy, this lady being denied the minimum benefit from the United States of Social Security disability benefits. Thank you, your honors. Thank you, counsel. Thanks to both counsel and the cases taken under advisement.